WALTER TATE, (IMPLEADED WITH HOLDEN EVANS) APPELLANT, vs. WILLIAM N. CLEMENTS, APPELLEE.

1. A purchase by a managing partner, engaged in carrying on the business of a copartnership established for the purpose of running a sawmill, of a quantity of chopped corn, the partner ordering it representing that it is required for the business of the firm, and proof that the corn was actually used in the business of the firm, is sufficient to establish

the presumption that the purchase was made in the regular course of the partnership business, and to charge the partners with the indebtedness.

2. A promise by a member of a late copartnership, made after dissolution and before a suit is barred by the statute of limitations, to pay a partnership debt, will not prevent the running of the statute so as to estop the other partner from availing himself of the defence of the statute as against the original cause of action; and this whether the creditor was aware of the dissolution or not.

3. Nor does an admission by one partner, after dissolution, that a debt is due, bind the other late partner so as to take the case out of the statute as to the latter.

4. The "cause of action" in a suit for goods sold is the expresss or implied promise to pay, and a promise by the party sought to be charged, or facts from which a promise legally results, within the period of the statute of limitations, must be shown to defeat the operation of the statute.

5. A member of a copartnership, after the dissolution, has no *agency* growing out of the former partnership relation to create or to perpetuate a liability of his late copartner for partnership indebtedness, as against the operation of the statute of limitations.

Appeal from the Circuit Court for Escambia county.

The facts of the case are stated in the opinion of the court.

*C. C. Yonge* for Appellant.

This is an action of assumpsit for the recovery of the price of a lot of chops alleged to have been sold by the appellee to the appellant in the month of January, (29th,) A. D. 1872, during the existence of a partnership in the saw-mill business, which commenced on the 29th day of January, A. D. 1872, and terminated on the 31st day of December of the same year, according to the articles of copartnership. The defendant Tate plead non-assumpsit and the statute of limitations of four years.

*First error.*—It is not denied that the account is barred as to defendant Tate, unless the promise of Evans, his late part-

ner, made after the dissolution of the partnership, will operate to prevent the bar. It is claimed that as no notice is shown to have been given to the plaintiff of the dissolution, that this promise was sufficient to prevent the bar of the statute. The doctrine is that one partner cannot bind another by any act of the dissolution, if the party has notice of such dissolution ; and if he has no notice, the promise of one partner can only be binding as to matters strictly within the scope of the partnership business. Story on P.

We deny that it is within the scope of a partnership, (as that expression is understood in the books) which partnership was formed to conduct a " saw-mill business," to make promises to revive debts. The promise of one partner to bind another is an incident of the partnership during its existence, necessary to the protection of those who deal with it, and for the convenience of the partners themselves, and when the principal to which it is an incident ceases to exist, the incident ceases also. The single exception that is allowed to this rule is : when transactions occur, after the dissolution, within the scope of the partnership, or the credit of the partnership, with parties who had no notice of the dissolution, and in such cases it is held that the power of one partner to bind another survives the dissolution. But the reasons upon which this exception rests do not apply to a promise to pay a debt already contracted. This, however, is neither necessary to the protection of the public nor the convenience of the partners. On the contrary it is one full of danger to the partners, for an insolvent partner may, in the exercise of such a power, years after the dissolution, (for if the power exists there is no limit to the time when it may be exercised) involve his late associate irretrievably by promises to pay debts that never existed. The promise would be harmless to the one making it, by reason of his insolvency, but destruction and ruin to his late partners. And when such promise relates to transactions of which the other

partners are ignorant, it becomes impossible for them to dis-
prove it, or make any effectual defence. When we inquire
into the source of this power of one partner to bind another,
it is found to be based on the doctrine of agency, and when
the partnership terminates the agency ceases, only surviving
it as to the exceptional transactions already alluded to. It is
absurd to say that making promises to pay debts is within
the scope of a partnership for the manufacture of lumber.
Acts that fall within the scope of a copartnership must be
acts that are connected directly with the particular business
the partnership is engaged in, whereas the power of one
partner to bind another during the partnership is common
to all partnerships.

The statutes of limitations in Florida have been recognized
by this court as statutes of repose, and not presumptions,
and you cannot therefore rely on the presumption that
might arise that a debt had not been paid from the promise
of one partner to pay it, but there must be a distinct prom-
ise by the party sought to be bound by it in order to pre-
vent the bar. See Angell on Limitations; Daniel on Ne-
gotiable Instruments, §358; Brisbon vs. Boyd, 4 Paige, p.
17; Gilchrist vs. Filyau, 2 Fla.

*Second error.*—The appellant claims that the court erred
in holding that if there was no evidence that the purchase
of the chops was a part of the business of Tate & Evans, or
that they were engaged in mercantile business, that the fact
that the chops were used for the benefit of the firm was suffi-
cient to bind the firm for payment. If this be law, then
the wholesome limitation of the authority of one partner to
bind another, in regard to transactions within the scope of
the partnership business, is destroyed, and it is only neces-
sary that the managing partner shall say that the debt con-
tracted (however foreign it may be to the legitimate busi-
ness of the partnership) was for the benefit of the firm, to
create an obligation on the firm to pay it. A partner in the

manufacture of cigars may purchase a ship to transport them, and make his associates ship-owners against their will and with as little knowledge of the purchase as defendant Tate had in this instance of the purchase of the merchandise, the subject of this action, the business of Tate & Evans being the manufacture of lumber, and nothing else. If Evans could bind the firm by the purchase of a bill of merchandise for $100, he could for any larger sum. No question of obligation on the part of Tate by acquiescence arises in this case, for it opportunely appears that he was ignorant of the purchase until just before suit was brought, some five years having elapsed, and there is no evidence of other transactions of a similar character, either by Evans or the firm of Tate & Evans. The same observations are applicable to the second and third special charges refused by the court.

The court will notice that all the proofs in the case are to the effect that Evans was the sole actor, and always in his individual character, in connection with this purchase, and the subsequent promises testified to. The purchase was by the individual order of Evans, and not in the name of the firm.

The appellee had but the one transaction with Evans, and none other with the firm. Had never seen Tate, and did not know him. Only knew he was a partner by hearing Evans say so. Only knew Evans to be managing partner from hearing him say so. All the promises were made by Evans, and in his individual name, and all the letters were written by him individually.

These facts prove the theory that this bill was purchased by Evans on his own credit, and is in accord with the idea that the purchase not being within the scope of the partnership, was not contemplated by Evans at the time to be made a charge against the firm, he doubtless intending to pay it

himself, and credit himself with the advance. This also explains the fact that Tate was never informed of it.

I think it sufficiently appears that the court could, in its rulings, and ought to have granted a new trial.

The appellant refers to case of Roumlee vs. VonKeown, 2 Comstock, 523; Shoemaker vs. Benedict, 1 Kernan, 184; Bell vs. Morrison, 1 Peters, 351; and Payne vs. Slate, 39 Barb., 638.

The above cases establish the proposition that a joint contractor cannot bind his co-contractor by a promise to pay a debt, either barred or not barred, and on the ground that the statute runs against action that had not *accrued* within a given time. If dating from the contract the statute has run, all rights under that contract are gone, and if the party relies on a new contract, to-wit, a promise to pay them, no one is bound but the party promising, either by himself or his agent.

In the case of a partnership, it cannot be claimed that the partner is an agent, because the agency was determined by the dissolution.

The case of Payne vs. Slate, (39 Barbour, 638,) decides that the power of a partner to renew a debt is the same as that of a joint contractor, and nothing more.

No liability can be created on the credit of a partnership which has been dissolved, unless the firm name be used in making the contract. McDonald vs. Fowler, Sneed (Ky.) 245; Kirby vs. Hewitt, 26 Barb., 607.

As to business not connected with the partnership business, one partner cannot bind his copartner by a contract not within the scope of the partnership business, and a knowledge of the limited nature of the partnership may be inferred from circumstances. Livingston vs. Bonvelt, 4 John., 251; Long vs. Carter, 3 Iredell, 238; Minor vs. Downie, 19 Vt., 14; Daniel on Negotiable Instruments, 358.

*J. C. Avery* for Appellee.

Clements sued Tate & Evans, late copartners, for the price of one hundred bushels of chops. The defendants pleaded—1st, the statute of limitations; 2d, the general issue.

The evidence shows: Tate & Evans were copartners at the time the debt sued upon was contracted, doing a saw mill business. Evans, who was general manager and superintendent of the business, purchased the chops for and in behalf of the firm, and the same were used by the firm. The firm was dissolved in December, 1872, but no notice of the dissolution was ever given, and the plaintiff, Clements, never knew of the dissolution. Within four years appellant's copartner repeatedly promised to pay the debt to Clements. The jury found for Clements, and judgment was entered against both Tate & Evans.

Tate moved for a new trial upon the following grounds:

1. That the verdict was against the weight of the evidence.

2. That the verdict was unsupported by the evidence.

3. That the court erred in charging the jury "that notwithstanding the dissolution of the partnership between Tate & Evans by the terms which limited its duration, and though the law is that the promise of one partner after dissolution cannot take a debt out of the statute of limitations as against another partner, yet, if there has been no notice of dissolution, such promise to a creditor whose claim accrued during the partnership, and who has not had notice of the dissolution, binds all partners;" and in refusing to charge the jury—1st, that unless there is some evidence that buying chops was a part of the saw mill business, or that they had a partnership in mercantile business, the defendant is not liable; 2d, that unless there is proof that satisfies you that the buying of chops was within the scope of the partnership proved to be for conducting a saw mill, that Evans had no power to bind Tate by the purchase of the chops;.

3d, that it is not sufficient to bind the partnership that the goods were used for the benefit of the partnership.

The motion was denied, and Tate prosecutes his appeal to this court.

If the court erred as alleged in the third ground of the motion, the first and second are good, but not otherwise. It is therefore necessary to consider the third ground only.

I. Did the court err in the charge given? I think not.

For most purposes one partner is the general agent of his copartners within the scope of the firm business, and the rules which govern in other cases of general agency will apply. Story on Agency, §37.

As to an agent, the revocation of his authority takes effect, so as to bind third parties, when it is made known to them, and not before. Ibid., §470.

The same rule applies to partners. One may bind his late copartner after the dissolution of the copartnership and revocation of agency, if the party with whom he deals has no notice of the dissolution. Parsons on Part., 436–7; 3 Pick., 177.

The commercial world fully recognizes the necessity of notice. All are authorized to think him a partner whom they have had held out to them as a partner, if they have had no notice of his ceasing to be one. Parsons on Part., 426–7 and 412.

It has been held that where there was a dissolution of the copartnership and a subsequent part-payment of a copartnership debt by a partner to a creditor, who did not know of the dissolution, the case was taken out of the statute. Tappan vs. Kimball, 10 Foster, 136, cited at 3 Parsons on Contracts, §83.

Why should not an express promise have an equal result? The argument I make is briefly this: During the partnership one may take a debt out of the statute, as to all, by his promise. After the dissolution, one, dealing with a person

without notice of the dissolution, may bind his partners as if there had been no dissolution. Hence the promise of one partner, after the dissolution, may take the debt out of the statute as against all the partners, in favor of one without notice of the dissolution. Such a rule is just.

Had Clements been advised of the dissolution, he would have known that Evans' promise would not bind Tate, and would have brought suit in time to save his action against the firm.

Where both parties are innocent, he must suffer whose negligence occasioned the error. Pars. on Part., 426–7.

II. Did the court err in refusing the charges asked for by Tate?.

The judge assigned the following reason for his refusal: "The purchase by a partner for the partnership raises the presumption of buying within the scope of the partnership business, and the onus is on the objecting party to prove the contrary."

This reason is valid and supported by the law maxim, *Omnia praesumuntur legitime facta donec probetur in contrarium.* Co. Litt., 232, b.

Evans was a partner when he bought the chops, and had the entire management of the business. It is proven they were bought for and used by the firm.

It must therefore be presumed that what Evans did he did within the scope of his power, until the contrary be shown.

The rules of agency may be again invoked.

The responsibility of the principal to third parties is not confined to cases where the contract has been actually made under his express or implied authority. It extends further, and binds the principal in all cases where the agent is acting within the scope of his usual employment, or has held out to the public or the other party as having competent authority, although he has, in fact, in the particular instance,

exceeded or violated his instructions or acted without authority. Story on Agency, §443.

This rule would, when applied to partners, seem to bind Evans' copartner for Evans' contract, even if out of the scope of his duties as managing partner, under the circumstances of this case.

As a matter of fact, however, of which the court might perhaps take judicial notice, (saw milling being the leading industry of the locality where this action arose,) the buying of chops is incidental to the saw mill business for the purpose of providing feed for the beasts employed in the hauling of logs.

THE CHIEF JUSTICE delivered the opinion of the court.

The plaintiff below (appellee) declared against appellant and Evans, as late copartners under the style of Tate & Evans, and alleged that they were indebted to him in the sum of one hundred and ten dollars for "one hundred bushels of chops," sold and delivered to them, and in the further sum, &c., (common counts.) Suit was commenced April 26th, 1877. Defendants plead non-assumpsit, and the statute of limitations; that the cause of action did not accrue within four years next before suit. Upon which pleas the plaintiff joins issue. Upon the trial the plaintiff testified that the firm of Tate & Evans, lately doing business at Bluff Springs, Florida, were indebted to him in the sum of one hundred and ten dollars, the purchase money for one hundred bushels chopped corn, sold and shipped to them March 1st, 1872, at one dollar and ten cents per bushel; that it has not been paid; that the firm (by Mr. Evans) has repeatedly promised to pay him within the past four years, verbally and in writing, as shown by Evans' letters exhibited, dating from July 14, 1873, to November 17, 1874. Plaintiff corresponded with Evans, who held himself out

as the managing member and superintendent of the business of the firm; knows of the existence of the firm and its business and management by what Evans told him; of his own knowledge he knows nothing of the dissolution of the firm, and has never received any notice of the dissolution, or that the copartnership had ceased.

On cross-examination plaintiff says he only knows of the existence of the firm by what Evans told him, and has no other knowledge of the commencement of the partnership; the corn was shipped to them on the written order of Mr. Evans, March 1st, 1872; that Evans told him in June, 1872, that such a copartnership existed, and that the business of the firm was the manufacture of pine lumber by steam power, at Bluff Springs; the shipment of this corn was the only transaction he had with the firm; that he has never met Mr. Tate, and does not know him personally.

H. Evans testified that he was superintendent and general manager of the business of Tate & Evans in running a saw mill. In behalf of the firm he purchased of plaintiff one hundred bushels of chops for the firm March 1st, 1872, and it was used by the firm. There was no notice publicly given of the dissolution of the firm. Plaintiff produced three letters signed H. Evans addressed to plaintiff; one dated July 14th, 1873, in which he says:

"Your favor of a recent date to hand. I very much regret that I am not prepared at present to pay you the amount due by Tate and myself, but feel sure that I will be in the course of sixty or ninety days. At any rate you shall have your money long before you can get it by course of law."

The next letter is dated at the "office of Bluff Springs Lumber Company," November 28th, 1873. In this he says:

"Our mill was suspended some two months since, there being no business and no prospects, but that as soon as *we* begin to saw, any lumber you need or can dispose of *I* will

be glad to cut for you.  *I* have no money, but the first *I* get you shall have."

The third letter is also dated at the " office of the Bluff Springs Lumber Company," November 17th, 1874.  In this he says:

"I will take pleasure in cutting lumber for you, or if you can still indulge me I will pay you the money."

Walter Tate, in his own behalf, testified that the firm of Tate & Evans was formed by written articles of copartnership for the purpose of doing " saw mill business," and no other ; that he did not authorize the purchase of the chops by the firm, or by Evans; had no knowledge of the contracting of this debt until a few days before suit ; that prior to that time no demand had ever been made for payment, or even notice of its existence had been given either by Evans or any other person.  The copartnership began 29th January, 1872, and terminated by the terms of the articles of copartnership December 31st, 1872.

The articles of copartnership were produced in evidence. They recite that Tate and Evans have formed a partnership to expire 31st December, 1872, in which it is agreed that Evans is to take charge of the mill business as superintendent of all work connected with the interest at Bluff Springs, for a compensation, and that Tate " shall take charge of the proceeds of business at Pensacola, in the collection of funds due, and see to the proper disbursement of the same until outstanding dues are settled," &c.

The judge charged the jury, among other things, " that notwithstanding the dissolution of the partnership between Tate and Evans by the terms which limited its duration, and though the law is that the promise of one partner after dissolution cannot take a debt out of the statute of limitations against another partner, yet, if there has been no notice of dissolution, such promise to a creditor whose claim accrued during the parthership, and who has not had notice

of the dissolution, binds all partners." The court refused to charge as requested by defendant:

1st. That unless there is some evidence that the buying of chops was a part of the saw mill business, or that they had a partnership in the mercantile business, then defendant Tate is not liable.

2d. That unless there is proof that satisfies you that the buying of the chops was within the scope of the partnership proved to be for conducting a saw mill, that Evans has no power to bind Tate by the purchase of chops.

3d. That it is not sufficient to bind the partnership that the goods were used for the benefit of the partnership.

The above portion of the charge, and the refusal of the court to instruct the jury as requested, were excepted to, and are assigned as errors. A motion for a new trial on these grounds was denied.

Whether the "buying of chops" was legitimately connected with the business of this partnership, (which was formed for the purpose of running a saw mill,) is a question eminently proper for a jury to decide. "Chops" is probably a provincialism, and we conclude from the testimony and the evident agreement of counsel on the subject, that they understood it to mean "chopped corn." Beyond this we are left to conjecture. It is difficult to say judicially that chopped corn is or is not necessary to carry on a steam saw mill, and yet it may be useful either as fuel, or as food for men and working cattle. It is equally difficult to determine abstractly whether the buying of horses is within the scope of this partnership. If the jury who tried this case was competent to judge that horses and oxen were necessary or useful in hauling logs and lumber at a saw mill, it was equally competent in them to determine that "chops," or chopped corn, was a proper food for the animals, and that the animals required food to sustain life. But we find no direct evidence that this firm employed any working cattle,

and we look further to find that it was shown by the testimony of Evans, the superintendent and general manager of the business of the firm, that he ordered from the plaintiff, in the name and for the use of the firm, one hundred bushels of chops, on the 1st of March, 1872, during the term of the partnership, and that the chops were used by the firm. This evidence was submitted to the jury, under the suggestion of the court, " that a purchase by a partner for the partnership raised the presumption of being within the scope of the partnership, and the onus is on the objecting partner to show otherwise."

This, together with the refusal of the court to give the instructions asked for by defendant's counsel, forms the ground of exception and the alleged error. The ruling of the court has reference to the circumstances of the case before it. Evans, the managing partner, had authority to conduct the business, which implied that he had power to purchase such articles as he deemed necessary for the prosecution of the partnership business. He had ordered, in behalf of the firm, an article which he represented he wanted for the use of the firm, and which was afterward actually used in the business of the firm. This was in March, 1872. In June the plaintiff was informed for the first time, so far as appears, of the general character only of the partnership business. The articles of the copartnership had not been made public, and the plaintiff knew nothing of them.

In the case of Winship et al. vs. the Bank of the U. S., (5 Peters, 529–560,) Chief Justice Marshall, in delivering the opinion of the court, says : " That if the particular terms of the articles were unknown to the public, they had a right to deal with the firm in respect to the business thereof upon the general principles and presumptions of limited partnerships of a like nature ; and that any special restrictions did not affect them ; that in such partnerships it was within the general authority of the partners to make and

endorse notes, and to obtain advances and credits for the business and benefit of the firm, and if such was the general usage of trade, the authority must be presumed to exist, but that it did not extend to transactions beyond the scope and object of the copartnership. * * * When a partnership is formed for a particular purpose, it is understood to be in itself a grant of power to the acting members of the company to transact its business in the usual way. * * It is usual to buy and sell on credit, and if it be so, the partner who purchases on credit, in the name of the firm, must bind the firm. This is a general authority held out to the world, to which the world has a right to trust. The articles of copartnership were, perhaps, never published; they are rarely if ever seen, except by the partners themselves. The stipulations they may contain are to regulate the conduct and rights of the parties as between themselves. The trading world, with whom the company is in perpetual intercourse, cannot individually examine these articles, but must trust to the general powers contained in all partnerships. The acting partners are identified with the company, and have power to conduct its usual business in the usual way. This power is conferred by entering into the partnership, and is, perhaps, never to be found in the articles. If it is to be restrained, fair dealing requires that the restriction should be made known. These stipulations may bind the partners, but they ought not to affect those to whom they are unknown, and who trust to the general and well established commercial law." Citing 2 H. Black., 235; 17 Ves., 412; Gow. on Part., 17; see also Collyer on Part., 3 Am. Ed., §384, et seq.

From the general principles here announced, it seems to us that the instructions to the jury were proper and applicable to the facts proved; and it seems further, that however correct the abstract proposition contained in the instructions prayed for, if it could be insisted that the plaintiff had been

informed that the articles of copartnership restricted the power of the individual partners in the premises, so as to forbid the purchase of anything but logs, yet, as the instructions were confined to a consideration of the provisions of the articles themselves, which it is not pretended had been brought to the notice of the plaintiff, the court properly refused to give them.

Upon the facts of the case, so far as they relate to the purchase of the "chops," the plaintiff had the very best reasons for believing that the purchase was made in the due prosecution of the business of the firm. The goods were forwarded upon the order of one of the partners, and this was *the* one especially entrusted with the business; and this order implied that the "chops" were required in the prosecution of that business. This, with the fact further proved by the managing partner, that the article purchased of the plaintiff by him, in the name and for the business of the firm, was actually used in the business, precluded the assumption that it was other than a legitimate transaction upon partnership account, and under any proper instruction the jury could not well have found otherwise.

The other question, and the more important one in this case, is, whether the court erred in charging the jury that a promise by one partner, after the dissolution of the partnership, to pay a debt of the firm to a creditor who had no notice of the dissolution, would bind the other partner. There is no question that a promise to pay by one partner, or a part payment of a debt by one during the existence of the partnership, will be binding upon the others so as to take the case out of the operation of the statute of limitations. 3 Kent's Comm., Lecture 43.

The question here is, whether a promise to pay by one partner after dissolution, and before the statute has run, will revive the debt, or take it out of the operation of the statute as to the other partner. The question has under-

gone very much discussion, and is not entirely settled in this country.

The leading case in England was Whitcomb vs. Whiting, (2 Douglas, 652,) decided in 1781, which was an action upon a joint and several promissory note against one of the makers, and it was held that proof of payment by one of the others of interest on the note and part of the principal within six years, took the case out of the statute as to the defendant who was sued. The whole of the reasoning of Lord Mansfield in that case was this: "Payment by one is payment for all, the one acting virtually for all the rest; and in the same manner an admission by one is an admission by all; and the law raises the promise to pay when the debt is admitted to be due." This case was followed in England for some time without question. Lord Kenyon, however, in 3 Esp. R., 155, expressed some doubts about its correctness; and Lord Ellenborough, in Brandram vs. Wharton, (1 B. and Ald.,) dissents from the doctrine while feeling bound to follow it. He instances the case of thirty or forty persons jointly liable for a debt, which one may actually have paid, yet having lost his receipt he is unable to overcome a promise made by one of the others without his knowledge or consent, and who may not have known of the payment, or who may have intended the very mischief against which it was the evident design of the statute to provide.

In the case of Bell vs. Morrison, (5 Peters, 351,) Mr. Justice Story, delivering the opinion of the court, says: The reasoning of Lord Mansfield "assumes that one party who has the authority to discharge has, necessarily, also authority to charge the others; that a virtual agency exists in each joint debtor to pay for the whole, and that a virtual agency exists by analogy to charge the whole. Now this very position constitutes the matter in controversy. It is true that a payment by one does enure for the benefit of the

whole; but this arises not so much from a virtual agency for the whole as by operation of law, for the payment extinguishes the debt.   *   *   If the principle of Lord Mansfield be correct, the acknowledgment of one joint debtor will bind all the rest, even though they should have utterly denied the debt at the time such acknowledgement was made.   *   *   By the general law of partnership, the act of each partner during the continuance of the partnership, and within the scope of its object, binds all the others.   It is considered the act of each and of all, resulting from a general and mutual delegation of authority.   Each partner may, therefore, bind the partnership by his contracts in the partnership business, but he cannot bind it by any contracts beyond those limits.   A dissolution puts an end to the authority. By the force of its terms it operates as a revocation of all power to create new contracts, and the right of partners as such can extend no further than to settle the partnership concerns already existing, and to distribute the remaining funds."

Referring to the case of Wood vs. Braddock, (1 Taunt., 104,) Justice Story, in the same opinion, says: "The doctrine in 1 Taunt. stands upon a clear, *if it be a legal*, ground; that as to things past the partnership continues, and must always continue, notwithstanding the dissolution.   That, however, is a matter which we are not prepared to admit, and constitutes the very ground now in controversy.   The light in which we are disposed to consider this question is that after a dissolution of a partnership, no partner can create a cause of action against the other partners except by a new authority communicated to him for that purpose.   It is wholly immaterial what is the consideration which is to raise such cause of action, whether it be a supposed pre-existing debt of the partnership or any auxiliary consideration which might prove beneficial to them.   Unless adopted by them they are not bound by it." .

The case in which these observations occur was one in which the statute of limitations had run before the promise or admission by one of the partners was made. See also 3 Kent's Com. Lecture 48.

The Supreme Court of New York, Kent, C. J., in Hackley, survivor, vs. Patrick, *imp.* with Hastie, (3 John., 536,) held that "after a dissolution of a copartnership, the power of one partner to bind the other wholly ceases. There is no reason why his acknowledgment of an account should bind his copartners, any more than his giving a promissory note in the name of the firm or any other act." The statute of limitations did not enter into that case, the sole question being as to the power of one partner, who was authorized to adjust the debts due from the copartnership, to bind the others by his admission after the dissolution.

Spencer, J., in Walden vs. Sherburne, (15 John., 424,) referring to the case of Hackley vs. Patrick, says: "It seems that the Court of Common Pleas in England have held otherwise, (1 Taunt.,) but I believe there is more safety in the rule of this court than in a contrary one." The same rule was applied in Baker vs. Stackpole, (9 Cowen, 420,) and it was held that the admission of one partner, either of an account *or any fact,* made after the dissolution of the partnership, is not admissible as evidence to affect any other member of the firm.

In the New York Court of Appeals, Van Keuren vs. Parmelee, 2 Comst., 523, in a case where a promise was made by one partner nine years after the partnership was dissolved, and four years after the statute of limitations had fully run, to pay a note of the firm, Bronson, J., delivering the opinion of the court, says: "In reference to the statute of limitations, a distinction has sometimes been taken between a promise made before the statute has run and one made after the parties have been exonerated by the lapse of time. That would sustain the defence in this case; for the

statute had run upon the claim long before the new promise was made. But the defence may be rested upon the still broader ground that the dissolution of the partnership was a revocation of the agency, and the power of the partners to bind each other by new engagements ceased from that moment." The opinion in that case contains an extensive notice of the cases involving the question, and remarks that "the statute of 21 James I., c. 16, which limited actions on promises to six years, was not very well received by the legal profession, and although the early decisions under it are not open to much observation, it was not long before the courts began to regard the statute with disfavor, and to resort to the most subtle constructions for the purpose of restricting its influence. There was a period when one who was spoken to on the subject of an old debt could not well give a civil answer without saying enough to take the case out of the statute. At a later period, and since the commencement of the present century, the courts began to regard this as a beneficial statute, a statute of repose, and commenced the difficult task of retracing their steps." Noticing the brief reasons for the decision in Whitcomb vs. Whiting, the court says: "Nothing but the great name of Lord Mansfield could have given currency to this reasoning. It is plain enough that 'payment by one is payment for all,' so far as relates to the satisfaction of the debt, but that fact neither shows, nor has any tendency to show, a new promise or acknowledgment by the other joint debtors. Payment is nothing more than an admission that the debt is due, and like any other admission, it can only affect the party who makes it, unless he has authority to speak for others as well as himself. A joint debtor has no such authority." * * "If the meaning be that there is such an agency as will make the payment by one enure to the benefit of all the joint debtors, the reasoning is well enough, but it proves nothing on the point in controversy. If the meaning be that one joint

debtor is the agent of the others for the purpose of making admissions to bind them, that was assuming the very point to be proved, and the assumption had neither authority nor argument to support it.   There is nothing in the relation of joint debtors from which such an agency can be inferred. A joint obligation is the only tie that links them together, and from the nature of the case payment of the debt is the only thing which one has authority to do for all.   I am persuaded that such a decision would not have been made had it not been for the strong disposition which prevailed at the time to get around the statute of limitations."

The decision in Whitcomb vs. Whiting is said to have been in direct conflict with Bland vs. Haselrig, (2 Vent., 151,) which was decided ninety years before, and in the English cases that have followed, and in some of the early American cases, the same rule was applied, whether the new promise was made before or after the statute had run.   "The case of Whitcomb vs. Whiting (says Judge Bronson) has been several times questioned in England, and in Atkins vs. Tredgold (2 B. & C., 23,) the court seemed much disposed to disregard it.   But the authority of a great name has proved more than a match for common sense."   The learned judge reviews the cases in New York, beginning with Smith vs. Ludlow, 6 John. R., when the statute of limitations was in bad repute, and when few men ventured to think for themselves after Lord Mansfield had spoken, and shows that the courts of that State have been constantly struggling against the arbitrary rule of the judicial Warwick of England, until it has been entirely overthrown, and the Supreme Court of the United States sanctions the emancipation.   A still later case in New York was that of Shoemaker vs. Benedict, 11 N. Y., 176, where payments were made by one of several joint makers of a note before the statute of limitations had run upon it, and it was insisted by the plaintiff that this payment took the case out of the

statute as to all the joint makers. The court remarks that it was very well settled in New York before the case of Van Keuren vs. Parmelee, upon authority, that payment by one o f several joint debtors, before the statute had run, operated to take the case out of the statute as to all; but the court in this case, upon principle, held that such payments do not affect the defence of the statute as to the other debtors. The court says: "If a new promise is satisfactorily proved, the debt is renewed. The question still recurs, who is authorized to make such promise? If one joint debtor could bind his codebtors to a new contract by implication, as by a payment of a part of a debt for which they were jointly liable, he could do it directly by an express contract. The law will hardly be charged with the inconsistency of authorizing that to be done indirectly which cannot be done directly. If one debtor could bind his codebtors by an unconditional promise, he could by a conditional promise, and a man might find himself a party to a contract to the condition of which he would be a stranger. * * And in principle I see not why a promise made before the statute has attached to a debt should be obligatory when made by one of several joint debtors, when it would not be if the action was barred. The statute operates upon the remedy. The debt always exists. An action brought after the lapse of six years upon a simple contract must be upon the new promise, whether the promise was before or after the lapse of six years, express or implied, conditional or absolute;" and see also 5 Wend., 257; 1 Denio, 247.

In Tennessee, 7 Yerger, 534; 2 Humph., 166; in Pennsylvania, 17 S. & R., 126; 1 Pen. & Watts, 135; 10 Harris, 156; 7 Barr, 433; 71 Penn. St. Rep., 208; in Indiana, 2 Blackf., 371; in Illinois, 59 Ill., 524; it is held that a promise by one partner, after the dissolution of the partnership, to pay a note made by the firm, or pay a debt of

the firm, does not take the case out of the statute as to other partners.

In Georgia, Dudley, 138; ib., 100; in North Carolina, 2 Hawks, 209; 5 Ired., 341; 45 Mo., 365; 51 Mo., 31; 35 Conn., 299; 36 ib., 270; it seems that a promise by one partner after dissolution, and before the bar of the statute has attached, is held to bind the other late partners.

Our statute of limitations (Laws 1872, ch. 1869,) declares, sec. 1, that "civil actions can only be commenced within the periods prescribed in this act after the cause of action shall have accrued." Sec. 10: "Actions other than those for the recovery of real property can only be commenced as follows: * * Within two years, first, * * second, * * third, an action on an open account for goods, wares, and merchandise sold and delivered, and an action for any article charged in a store account, shall not be barred until four years."

The issue in the case at bar is whether the cause of action accrued within four years. The declaration does not state when it accrued. The replication takes issue upon the plea. This cause of action accrued when the "chops" were shipped by the plaintiff to the defendants upon their order, or it "accrued" upon the promise of the defendant Evans, contained in his letters, or upon the promises made by him verbally within the past four years. What the language of the verbal promises was does not appear. Evans' first letter (July 14, 1873,) regrets that "I am not prepared at present to pay you the amount due by Tate and myself, but feel sure that I will be in the course of sixty or ninety days; at any rate, you shall have your money long before you can get it by course of law."

The next letter dated at the office of another mill company of which H. Evans was "superintendent" and "E. C. Elmore secretary," proposes to let plaintiff have lumber as soon as they "begin to saw," in "liquidation of my indebt-

edness to you. I have no money, but the first I get you shall have." The third letter from the same office as the foregoing, says: "Anything that I have can go towards what I owe. If you need lumber I will take pleasure in cutting it for you; or if you can still indulge me I will pay you the money." Every promise here expressed is that "I" will pay.

The first letter evidently refers to the indebtedness of Tate & Evans, and so probably do the last two. The first admits an indebtedness by "Tate and myself," and he promises to pay in sixty or ninety days; in the last two he promises to pay in lumber or in money as soon as he can get it.

During all this time the plaintiff never once calls upon Tate for payment, though Evans always fails to pay according to his promise, and never seeks Tate in any way, and does not know him in person, and leaves him in ignorance that any such indebtedness ever existed against him until five years have elapsed after the accruing of the debt, and the obligation to pay it. This cause of action accrued, so far as the firm is concerned, March 1, 1872.

Did any *cause of action* accrue as to both defendants at any other time? "Each partner may bind the partnership by his contracts in the partnership business, but he cannot bind it by any contracts beyond those limits. A dissolution, however, puts an end to the authority. By the force of its terms it operates as a revocation of all power to create new contracts, and the right of the parties as such can extend no further than to settle the partnership concerns already existing, and to distribute the remaining funds."

The court further says (in Bell vs. Morrison) that this point came before the twelve judges in the case of Hyling vs. Hastings, (1 Lord Raymond, 389, 421,) in the time of Lord Holt. There, one of the points was whether the acknowledgment of a debt within six years would amount to a new promise to bring it out of the statute? and they were

all of opinion that it would not, but that it was *evidence* of a promise. "Here, then, the judges manifestly contemplated the acknowledgment, not as a continuation of the old promise, but as evidence of a *new* promise, and that it is the *new* promise which takes the case out of the statute. Now what is a new promise but a new contract? a contract to pay upon a pre-existing consideration which does not of itself bind the party to pay independently of the contract?" The argument of the opinion referred to relates to a case where the statute had run before the new promise was made; but we see no logical difference between an acknowledgment or promise made before or after the operation of the statute, for, as we have seen, the power of the partners to bind each other by promises or contracts which shall affect their future liability is gone the moment the partnership is dissolved. None of the partners can create any new contracts or obligations binding upon the partnership; none of them can buy or sell or pledge goods on account thereof; none of them can endorse or transfer the partnership securities to third persons, or in any other way make their acts the acts of the partnership. In short, none of them can do any act or make any disposition of the partnership property or funds in any manner inconsistent with the primary duty now incumbent upon all of them of winding up the whole concerns of the partnership. And here, the consideration naturally arises whether, since it is incompetent to any of the partners after a dissolution, by any new acts, duties or obligations, to bind the partnership by any acknowledgments or declarations or statements subsequently made by any one of the partners, respecting the real or supposed transactions or duties or obligations of the partnership during the continuance thereof, are binding, as evidence or otherwise, upon the other partners who have not assented thereto. It seems difficult upon principle to perceive how they can be any more than the declarations or acts or acknowl-

edgments of any other agent of the partnership would be after his agency had ceased. In the latter case, they are constantly held inadmissible by the courts of common law, upon grounds which seem absolutely irresistible; and yet the contrary doctrine has been constantly maintained as to partners for a great length of time in the courts of common law in England, founded upon a mere unreasoned decision in the time of Lord Mansfield." Story on Part., §§322–23; 4 John., 224; 15 John., 409; 1 Metcalf, 486; 1 Hill, 572; 2 Hill, 520; 9 Cowen, 420.

The new promise relied on is a new contract upon which the action is based, when it is sought to sustain it by evidence of a new promise, when, but for the new promise, the action would have been barred by the statute. Green vs. Crane, 2 Lord Raym., 1101; Dean vs. Hewitt, 5 Wend., 257; Tompkins vs. Gardner, 1 Denio, 247.

Best, C. J., in Scales vs. Jacob, 3 Bing., 329, says: " In none of the cases has any distinction been made as to the time of the promise, whether before or after the six years; but it is clear that after the six years the plaintiff has no cause of action except on the new promise, and that being conditional, the condition attached to it must be observed."

The statute operates upon the remedy. The debt always exists. An action brought after the lapse of six years upon a simple contract, must be upon the new promise, whether the promise was before or after the lapse of six years, express or implied, absolute or conditional. The same authority is required to make the promise before as after the six years have elapsed. Shoemaker vs. Benedict, 11 N. Y., 186.

Angell, in his work on Limitations, (Chap. 20, Sec. 25,) says: " After collating and reviewing the cases in England and in this country, that the point to be resolved in all cases is, whether the promise is a mere continuation of the original promise, or whether it is a *new contract*, springing out of, and supported by the original consideration. It clearly ap-

pears, both upon principle and authority, that it is the latter, and the decisions of all the courts throughout the country are remarkably uniform in so establishing it." See also Ch. 21, Sec. 3.

The doctrines held by the courts at an early day, and soon after the enactment of the statute of limitations, that a mere acknowledgment that a debt was not paid or satisfied implied a promise to pay it, is not sustained upon any sound principle. The statute does not proceed upon the theory that after the period of limitation the debt was presumed to be paid, but it was designed as a measure of repose operating upon stale demands. The statute does not declare that if suit is not brought within four years, the demand is presumed to be paid. The presumption of payment arose upon specialties after twenty years, but the statute of limitation declares that " civil actions can only be commenced " within the prescribed period after cause of action accrued. Proof by the acknowledgment of the debtor that a demand is not satisfied, is not more satisfactory than other convincing evidence of the fact, and yet it was never held that such other proof that a claim had not been paid, or otherwise liquidated, draws after it the presumption or implication of a promise to pay, and thus create a new right of action. Why, then, should proof of the fact of nonpayment by an admission of the party be anything more than evidence of the fact; and upon what principle can it be said that one mode of proof draws after it consequences which do not follow the other mode? We cannot discern in the admission that there was a debt due " by Tate and myself" anything more than the fact that the debt was then due. No promise is implied. To imply a promise from mere evidence that the demand is not satisfied, would be a bald judicial repeal of the statute, and a nullification of its purposes. The Legislature does not say that the action can only be commenced within four years, *unless* it be shown

that the debt is still due. The language is, without qualification, that the action must be commenced within a given period after the " cause " shall accrue. In an action upon a sealed instrument after twenty years, a plea of payment was the proper plea, and the presumption of payment arose from the lapse of time.

In a suit upon a simple contract, the plea was that the suit was not commenced within a given time after the cause of action accrued, the statute operating as a bar to the suit, because the suit was forbidden by its express terms. The " cause of action " must then be some fact occurring within the time limited.

The action of *assumpsit* is upon promises expressed or implied. A promise to pay a debt, if made within the statutory period before a suit is commenced, is a cause of action, the thing purchased being the consideration of the thing promised, and this is equally the case whether the promise be made on the day of the purchase, or after five years have run—there is no difference; the action must be upon the promise.

All the cases declare that it is the new promise that avoids the operation of the statute, and is the *contract* upon which, if at all, a recovery can be had. The promise is, therefore, the " cause of action," upon which the plaintiff must rely to maintain this suit.

Evans' letter of July 14, 1873, says : " I very much regret that I am not prepared at present to pay you the amount due by Tate and myself, but feel sure that I will be in the course of sixty or ninety days." This is the only occasion on which Tate's name is mentioned in the evidence of admission or promises. All the promises to pay are by Evans' alone, and in the first person. He does not say that the firm of Tate & Evans will pay, but " I will pay." He does not promise in the name, or in behalf of the firm, but in his own behalf; and it seems the plaintiff relied on him

and did not call upon Tate until a short time before the suit, and five years after the indebtedness was contracted. The only promise is Evans' individual promise, unless Evans, by virtue of the former partnership, was an agent of Tate, and his individual promise to pay was the promise of both. It has been shown that after a dissolution, the partners have no power to bind each other by any contract. The only power they possess is to pay and collect debts, to secure the partnership property, and to give receipts, acquittances and acknowledgments of their acts. Story on Part. §328.

This power to wind up the affairs of the partnership does not include the creation of evidence of each other's indebtedness.

In the case of the National Bank vs. Norton (1 Hill, N. Y., 572,) it was held that one partner could not, after dissolution, bind his copartners even by the renewal of a partnership note; nor would a power reserved to him in the articles of dissolution to settle the business of the firm, and for that purpose to use their name, enable him to so bind his copartners. We cannot, upon any theory that seems to be well founded, find any authority in one partner, after dissolution, to change in any manner the legal liability of his late copartners, otherwise than by paying and adjusting the liabilities of the firm, and thus releasing them. But it was said in the plaintiff's brief and argument that because plaintiff had no notice of the dissolution, therefore the partnership continues as to the plaintiff. It is true that where partners have dissolved their relation, third persons who have had transactions with them will be protected in *future* dealings with the partners on account of the firm, unless such third persons have actual or constructive notice of the dissolution. But this applies to future dealings only. As to past transactions the partners remain as they were, debtors, equally liable to pay as though the dissolution had not taken place. (Story Part., §334, and citations; Collyer on Part., §546, 3d

Am. ed.,) but without the power to bind each other by new promises or contracts in respect to such past transactions. Any other rule would place an unfortunate partner under a prolonged and increasing ban of indebtedness at the option of a copartner, who might choose to renew his late copartner's debts by his own mere promise to pay, while the victim might not know for years that he had a creditor. We have an instance in the case at bar. The promise of Evans to the creditor of the firm did not operate to the advantage of Tate, nor did the creditor part with anything of value by means of it. There was not even an agreement on the part of the creditor to extend the time of payment in consideration of Evans' promise to pay. The duty and the obligation of the several partners to collect partnership dues and pay partnership debts, do not include the power of each to charge the other by new promises in respect to past debts, either as to those creditors who have, or who have not, had notice of the dissolution.

The judgment as to the appellant is reversed, and a new trial awarded.